One more second, Your Honor. Gentlemen, thank you very much. My name is George Goyke. I'm counsel for Kathy Henricks. Kathy Henricks is now the ex-wife of John Henricks, who's the criminal defendant in the case that we're in, the envelope that we're in. John Henricks was convicted of a crime and sentenced to pay $1.3 million of restitution. This case is not about criminal law, though. It's about property rights, because Kathy Henricks was a joint owner of various property with John Henricks. Was a joint owner when? I had a little difficulty following the temporal nature of the argument. Are you speaking about the ownership interests as they were on the day the restitution order was entered? That's when the U.S. lien attached. Or are you discussing the ownership interests as they were after the divorce decree? Both impacted, Your Honor. That's why I'm confused. It's going to be one date or the other, but not both at once. So which of these dates is the correct date? The date of the entry of the restitution order created the judgment lien. And that's coextensive with what an IRS lien would be. Look, that lien precedes the divorce. That lien precedes the divorce. So it seems to me that we need to figure out what the ownership interests were on the day the lien attached and not anything else. But your brief is full of talk about what the divorce decree did and all sorts of post-lien events. Is any of them relevant? I believe that it is, Your Honor, because the divorce decree created a new set of property rights between the people. No, it can't. The divorce decree is junior to the attachment of the lien. Whatever property rights the United States got, it got on the day of the restitution order, and a state court can't countermand a federal restitution order. It seems to me we need to figure out what the different parties, what Katherine's and John's rights were on the day of that order. Under 28 U.S.C. Section 3010, that's part of the Federal Debt Collection Practices Act, it talks about co-owned property. If we're talking about the date of the restitution order, that statute says that the remedies available to the United States under this chapter, which includes the collection of restitution, may be enforced against property which is co-owned by a debtor and any other person only to the extent allowed by the law of the state where the property is located. So now we're delving into Wisconsin law. Indeed we are. And I ask my question because your brief doesn't focus on what Katherine's rights were on that day. And if that's the right question, that's what we needed to have addressed in the briefs. The district court didn't focus on that either, and the United States brief doesn't focus on that. I'm not sure how we're supposed to decide this case with everybody picking different dates rather than everybody concentrating on what was true on a single day. Well, let's concentrate on that date, Your Honor. Wisconsin is a marital property state. It's the only state in the union that switched from common law, like Illinois and Indiana, into a community property type system. So under Wisconsin law, there's two types of property. There is individual property. Kathy Hendricks has some individual property because after the sentencing, her father gave her a gift to put down as a down payment on her new house when she abandoned the old family homestead. Okay? There's individual property. There's no joint ownership there, you're saying? No joint ownership there at all. And then there is marital property. And marital property is essentially everything that was acquired during the marriage. Okay? So we've got on the date of the entry of that restitution order and the establishment of the lien, we have Kathy Hendricks owning a retirement plan. The money that went into that retirement plan was completely from her employment. Okay? We have the couple being owed, the district court judge's decision says it was a state tax refund. It's actually a federal tax refund. Okay? It was about $18,000 that was owned jointly at that time. There was a new business that had been created called AJ's Auto Body. Okay? AJ's itself owned a building that was acquired with 100% financing from a bank. It owned some equipment that was under lease, like the paint booth is from the paint company. Okay? The mechanics owned a bunch of tools, and then there were some miscellaneous parts and stuff. This is the stuff that was sequestered in that shed, included the Hendricks lawnmower in that shed. So we have AJ's that existed on the date of the entry of the restitution order. Who owned AJ's? The only member of that business was Kathy Hendricks. What equity? You said it was 100% financed by the bank? The building was, yes. So what was the equity value of the AJ's at that time of the entry of the judgment? Our argument is zero because the real estate was 100% financed. The major pieces of equipment weren't owned. There's an argument being made in the briefing here that AJ's couldn't have existed but for the fact that things from custom collision were stolen, liquidated into cash, and the cash used to support the business, there's no evidence of that. And also in the United States brief, they talk about the fact that CoVantage Credit Union had the lien on custom collision. So any assets that might be recovered back to the old business wouldn't be available for restitution victims. They'd be available for the bank, which was also not made whole in this whole process. So you know that stuff was bought with stolen money? What's that? It was all bought with stolen money. Is that what you're saying? No, no, no. There's an allegation that it was. We never have an evidentiary hearing at all in Kathy Hendricks' involvement in this case. Lots of things arise from the criminal procedure where we weren't allowed to be involved at all. We weren't a defendant. The United States says that you were invited to be involved and declined. Is that representation false? I would say so, Your Honor. All right. We have no right to participate in the sentencing of a defendant. Counsel, somebody is not telling us the truth. The United States says that your client was invited to participate and declined, and you say that she was not invited. Do I have the positions accurately? You do. All right. We will figure out who's telling us the truth and who's lying to us. Okay. In Judge Crabb's decision. Let me ask you one more question. Sure. Did you contend in the district court that the correct day on which to measure property interests was the day the restitution order was entered? I contended both. That's the problem. You can't say A and not A and be very credible to a judge. Did you contend that that was the right day, or were you simply arguing the right day is whichever one is better for my client? No, Your Honor. The argument to the district court was that Wisconsin marital property law sets the property rights of the couple. That's not the question I am asking. Obviously, Wisconsin law determines property interests. The question is, as of what day did you argue in the district court? Because you didn't argue on appeal that the right day is the day of the restitution order. It was in there, but I also argued that the divorce made some changes to those property rights. I just don't see how the divorce can be relevant because it postdates the lien. I understand that argument, Your Honor. Okay. Back to quickly marital property and the judge's decision. There was a decision that the tax refund should be allocated according to the earnings that each of them earned to contribute toward the tax refund. So there was an unequal division of the tax refund. In the original order of the district court, there was a determination that since all of the earnings that went into the retirement plan were Kathy Henrich's earnings, that that would be Kathy Henrich's asset. On the motion for reconsideration, the judge said, no, no, no, no, this is 50-50. It's marital property. It was acquired during the marriage. It should be split 50-50. If that's the case, then the tax refund also needs to be split 50-50. If she had it right the first time, then the tax refund is correct and the retirement plan would belong entirely to Kathy Henrich's. I would like to reserve the rest of my time for rebuttal, if I could. All right. Thank you, Mr. Corky. Ms. Loring? May it please the court, my name is Heidi Loring and I represent the United States in this matter and I represented the United States Malone District Court. To respond to the court's questions and the appellant's argument, the correct date is January 10th of 2014. That is when the restitution order was entered and that's when the lien attached. That is the argument that the United States So why is your brief full of arguments about whether the divorce was a real divorce and whether Katherine and John were cooperating? All of that seems quite irrelevant if the right day is the day of the restitution order. Everything that follows afterward is irrelevant once the lien is in place. I thought our brief was clear and I apologize if it wasn't. It's not clear to me. I apologize, Your Honor. But our argument was the lien attached that day and that the divorce, the reason we went into the issues regarding the divorce And I think it wasn't clear to Judge Crabb because her opinion is chock full of stuff suggesting the divorce wasn't real and there were other machinations. If you just have a focus on this case about what were the rights on the day of the restitution order, all of that is irrelevant. But it seemed to be quite relevant to Judge Crabb. I think the court was trying to respond to Appellant's argument that the divorce somehow extinguished the lien. And our argument all along has been that the divorce did not extinguish the lien, the lien exists, and the property rights pursuant to Wisconsin law on the date the lien attached was John had a minimum, the defendant, had a minimum of a half interest in Katherine Henrich's retirement account and that Katherine Henrich's had no legitimate property interest in the fraudulent wages that are represented in the income tax refund and in the A.J.'s audit body, which was detailed in our brief as to how it was set up, money that was taken from CoVantage that was dirty money, fraudulent money, was used and put into checking and savings account in an A.J.'s checkings and savings account. Defendant went to the bank, International Bank of Amherst, and represented that he owned all the property of custom collision free and clear and that that would be the equipment they'd be using at the business. That was not true, and that is in the record. So that was the basis of the district court's decision that Katherine Henrich's had no legitimate marital interest under Wisconsin statute because it was not, that property was not legitimately earned and accrued pursuant to the statutes. That's why the wages were treated differently. We only were able to recover the portion of defendant's wages because she found that those wages were fraudulent. And regarding the hearing, I want to be very clear on that. The appellant has been represented by the same counsel throughout these criminal enforcement proceedings. We filed a motion for default and for resentencing, and appellant filed an objection. It's document, ECF document 103, filed on December 16th of 2014, and objected to the property we were asking to be liquidated, and at the bottom he says, wherefore Katherine Henrichs objects to the motion and requests a hearing thereon. Then in January, that next month, the court set a hearing, and appellant did not appear nor her counsel at that hearing. And even after that hearing, appellant never renewed her request, even when prompted by the court that she wanted another hearing. I don't know that the district court would have denied her a hearing, she just never renewed her request. On the docket, it's after entry 107, it's hearing set as to defendant Johnny Henrichs. It's a restitution hearing. The United States was present that day and prepared to proceed. Just to reiterate, I think the district court, it may have been confusing as to why we got into all the discussion about the divorce, but it really was regarding whether the divorce in any way extinguished that lien, and our argument, and I think the court found was, it does not. And her property rights, I think, were very clear at the time that our lien attached to defendant's property interests is that we are and to A.J.'s auto body because it was fraudulently set up. It is true that it was fully financed, but based on misrepresentations made by defendant to that bank, and cash was used to set it up, it's laid out in our brief. Tools, which this court has already affirmed the resentence of John Henrichs, and in that decision, this court found that the tools were laundered through a tool dealer named Pete Kern to help set up A.J.'s auto body. Well, it doesn't seem like there, as far as A.J.'s, there's not any value there, is there? We believe, from speaking with the international bank Amherst, who has the first mortgage on the real estate, that it's worth more, that there is a substantial non-exempt interest in that. I mean, that would be determined. Obviously, the United States could not go forward if there weren't any enforcement, but it's our belief that there is sufficient equity and maybe substantial equity in the real estate that A.J. sits on. Now, regarding the tools and other equipment, that is going to have to be sorted out because I think there's third-party creditors that would potentially, especially CoVantage, who still say their tools are in that business. So, you know, we'll have to be very careful on giving notice if there's any liquidation of the actual assets and equipment. But as far as the real estate, I think it's, we believe... So it comes down to that because a lot of times any kind of a business like that, some of the workers have their own tools. Correct. And then that's theirs and they keep... Right, and that very well would likely be the case here, at least for one of the employees. If the court has no further questions, the United States will rely on its brief and ask this court to affirm the district court's judgment. Thank you. Thank you, Mr. Lurie. Mr. Koecke?   ...that tools were being sold and laundered through this business. That all happened in the criminal case when we weren't involved. We never had a chance to listen to Mr. Curran's testimony, to cross-examine him as to what they thought were going on. We just had no opportunity. The court is relying on proceedings it had in sentencing what certainly the tenor of the decisions, the court seems to believe that he was a scoundrel. Okay? Could be worse terms for that. We weren't participating in that. As to the resentencing hearing, that was a hearing on the resentencing. That was not a hearing on property rights at that time. You can look at the text that's in that document. We had no right to participate in the resentencing hearing. We weren't the criminal defendant. Third parties can't come in and say the sentence should be sorter. We could be a character witness, but we can't participate in that hearing. I'm not sure what you mean when you say you can't. If the district judge invited your client to participate, then you could. But as we have already determined, the parties have, let's just say, different views about whether the judge invited Catherine to participate. We will look at the record. As to the tax refund, the earnings were post-sentence, post-indictment. There was no more activity going on in Custom Collision. AJ's Auto Body was a new startup. John Henricks worked in AJ's Auto Body. He was the body shop guy. His teenage son worked at his side to develop that. In fact, the son's initials are AJ. That was to be his business. It helped to have him occupied and not fretting about the fact that he was losing his father. So when the sentencing took place, young AJ continued to work in the business with another manager. And they each owned their own tools. And young AJ was proof of his purchase of his tools through the local tool dealers. So the money that was earned was legitimate. AJ's was a going concern. John Henricks got a paycheck. He was not the owner of that business, so he got a W-2. And there was a joint tax return filed where the tax refund under Wisconsin Marital Property Law has to be 50-50. There's no finding that this was illegal money or anything like that. With that, Your Honors, I'm running out of time, so I would rest unless you have any further questions. Apparently not. Thank you, Mr. Clark. Thank you. Thank you, Mr. Lurie. Case is taken under advisement.